## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NORTHERN FROZEN FOODS, INC. d/b/a NORTHERN HASEROT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE F/K/A UNITED SUGARS CORPORATION, AMERICAN SUGAR REFINING, INC., ASR GROUP INTERNATIONAL, INC., DOMINO FOODS, INC., CARGILL, INC., MICHIGAN SUGAR COMPANY, COMMODITY INFORMATION, INC., and RICHARD WISTISEN,<br><br>Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     SUMMARY .................................................................................................... 1

II.    JURISDICTION AND VENUE ...................................................................... 4

III.   PARTIES ....................................................................................................... 5

       A.    Plaintiff ................................................................................................ 5

       B.    Defendants ........................................................................................... 5

       C.    Agents and Co-Conspirators .............................................................. 9

IV.    FACTUAL ALLEGATIONS .......................................................................... 9

       A.    Relevant Market ................................................................................. 9

       B.    The History of Collusion in the Sugar Industry ........................... 16

       C.    Defendants' Agreement to Artificially Raise, Fix, Maintain, or
             Stabilize Prices of Granulated Sugar .............................................. 17

       D.    Governmental Guidelines Prohibiting Defendants' Conduct .......... 27

       E.    The Structure and Characteristics of the Granulated Sugar Market
             that Make it Highly Susceptible to Collusion ................................. 29

       F.    Defendants' Successful Inflation of the Price of Granulated Sugar
             Above Competitive Levels During the Class Period ....................... 34

V.     ANTITRUST INJURY & DAMAGES ......................................................... 35

VI.    CLASS ACTION ALLEGATIONS ............................................................... 36

VII.   FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING .................. 40

VIII.  CLAIM FOR RELIEF ................................................................................. 45

IX.    REQUEST FOR RELIEF ............................................................................ 47

X.     DEMAND FOR JURY TRIAL .................................................................... 49

Plaintiff Northern Frozen Foods, Inc. d/b/a Northern Haserot ("Plaintiff" or "Northern"), brings this action individually and on behalf of all other similarly situated direct purchasers. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges as follows based on personal knowledge as to the facts pertaining to itself and based on information and belief as to all other matters.

## I.    SUMMARY

1.    Plaintiff brings this suit against Defendants for their unlawful contract, combination, or conspiracy to fix the prices of Granulated Sugar sold throughout the United States.[1]

2.    Defendants are producers of Granulated Sugar – United Sugar Producers & Refiners Cooperative f/k/a United Sugars Corporation ("United"); American Sugar Refining, Inc. ("ASR"); ASR Group International, Inc. ("ASR Group"); Domino Foods, Inc. ("Domino," together with ASR and ASR Group, "ASR/Domino"); Cargill, Inc. ("Cargill"); and Michigan Sugar Company ("Michigan Sugar") (collectively the "Producer Defendants") – as well as industry information clearinghouse Commodity Information, Inc., and its principal and industry analyst Richard Wistisen (collectively "Commodity"). The Producer Defendants and Commodity will be referred to collectively as "Defendants".

---

[1] As defined below, "Granulated Sugar" is ordinary, white, table sugar made from cane sugar or beet sugar.

3. The Producer Defendants produce and sell the vast majority of Granulated Sugar sold in the United States. As of 2021, the Producer Defendants accounted for nearly 70% of the domestic Granulated Sugar Market.[2] The U.S. Granulated Sugar industry is projected to reach an estimated $13.5 billion in revenue in 2024.[3]

4. This conspiracy is a classic one: the Producer Defendants, the largest players in the domestic Granulated Sugar market, exchanged information – directly and indirectly – regarding prices, crop sizes, crop yields, capacity, demand, sales volume, future beliefs on pricing and sold positions, and other key competitively-sensitive metrics in order to avoid price competition and fix prices at supracompetitive levels.

5. In furtherance of this conspiracy, inter alia, the Producer Defendants shared and received information through Commodity, which bears all the hallmarks of the information sharing and enforcement mechanism of a price-fixing scheme. First, the data exchange through Commodity provides the Producer Defendants access to nearly real-time information on current and forward-looking data on competitors, which courts have cautioned holds "the greatest potential for generating anti-competitive effects."[4] Second, information gathered and disseminated through Commodity is specific to the Producer

---

[2] *See* Defendant United's Proposed Findings of Fact [Redacted], *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. May 26, 2022), ECF No. 231, ¶ 177.

[3] This estimate reflects NAICS Industry Code 3131, which may include raw and liquid sugar. *See Sugar Processing in the US – Market Size, Industry Analysis, Trends and Forecasts (2024-2029)*, IBISWORLD, https://www.ibisworld.com/united-states/market-research-reports/sugar-processing-industry/ (last visited April 13, 2024).

[4] *Todd v. Exxon Corp.,* 275 F.3d 191, 201 (2d Cir. 2011) (Sotomayor, J.) (quoting *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16 (1978)).

Defendants, is non-anonymous, and contains specific information on the Producer Defendants' profits, prices, costs, production levels, and sold positions – which are key metrics in this market because they indicate a producer's remaining supply. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[5] Finally, the information gathered and disseminated through Commodity is made available only to subscribing sugar producers and is completely unavailable to the public or other sugar suppliers. Again, courts have commented on the anticompetitive effects of private information exchange between competitors: "Public dissemination is a primary way for data exchange to realize its procompetitive potential."[6]

6.     In a competitive market, this kind of sensitive business information would allow industry participants to undercut each other on price and steal market share. Thus, it would be contrary to a firm's self-interest to share such information with competitors. In a cartel, however, access to this kind of information serves as reassurance that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.

7.     Beginning no later than January 1, 2019, Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar at supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Class paying supracompetitive prices for Granulated Sugar in the United

---

[5] *Id.* at 212.

[6] *Id.* at 213

States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8.      Among the victims of the conspiracy are persons and entities that purchased Granulated Sugar directly from the Producer Defendants or their co-conspirators, including but not limited to food and beverage manufacturers, retailers, food service companies, and distributors. Plaintiff, on behalf of itself and Class Members, seeks to recover the overcharges they paid.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). This court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

10.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (28 U.S.C. § 22), and pursuant to 28 U.S.C. § 1391(b) and (c), because, at all times relevant to the Complaint, one or more of the Defendants resided in this District, and all Defendants transacted business, were found, or had agents in this District.

11.      This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have

4

substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

12.     Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

### III.     PARTIES

#### A.     Plaintiff

13.     Plaintiff Northern is a privately owned Ohio corporation with its principal place of business at 21500 Alexander Road, Cleveland, Ohio 44146. Northern directly purchased Granulated Sugar that was produced and sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period. Northern has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

#### B.     Defendants

14.     Defendant United is a Minnesota corporation with its primary place of business at 8000 West 78th Street #300, Edina, Minnesota 55439. United is made up of four member-owners: United States Sugar ("U.S. Sugar"); American Crystal Sugar

5

Company; Minn-Dak Farmers Cooperative; and Wyoming Sugar Company, LLC.[7] United sells Granulated Sugar throughout the United States, primarily under the brand name Crystal Sugar.[8] United grows and processes sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming.

15.    Defendant ASR is a privately held Florida corporation with its primary place of business in West Palm Beach, Florida. It is a global producer and seller of Granulated Sugar. In 2013, ASR adopted the corporate brand name ASR Group.

16.    Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. ASR Group is a global producer and seller of Granulated Sugar. ASR Group owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California.[9] It is considered the world's largest supplier of refined sugar.[10] ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida,[11] business

---

[7] *Who We Are*, UNITED SUGAR PRODUCERS & REFINERS, https://unitedsugarpr.com/who-we-are/our-members/ (last visited April 13, 2024).

[8] *Products*, UNITED SUGAR PRODUCERS & REFINERS, https://unitedsugarpr.com/product-category/retail-products/ (last visited April 13, 2024).

[9] *American Sugar Refining to Acquire Tate & Lyle's European Sugar Operations*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/american-sugar-refining-to-acquire-tate--lyles-european-sugar-operations-97567009.html (last visited April 13, 2024).

[10] *American Sugar Refining unveils new brand name: ASR Group*, FOOD BUSINESS NEWS, https://www.foodbusinessnews.net/articles/836-american-sugar-refining-unveils-new-brand-name-asr-group (last visited April 13, 2024).

[11] *American Sugar Refining Completes Purchase of Tate & Lyle Sugars*, PR NEWSWIRE,

enterprises of the global sugar empire Fanjul Corp. ASR Group owns as a subsidiary Co-Defendant Domino as well as one of Domino's American competitors, C&H Sugar.[12] ASR Group owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

17.    Defendant Domino is a Florida corporation with its primary place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. Domino is a subsidiary of ASR and ASR Group's Granulated Sugar business and is a global producer and seller of Granulated Sugar.

18.    ASR/Domino sells Granulated Sugar in the United States under the brands Domino, C&H, and Florida Crystals,[13] as well as internationally under the brand names Redpath, Tate & Lyle's, Lyle's, Sidul, and Sores.[14]

19.    Defendant Cargill is a Delaware corporation with its principal place of business at 15407 McGinty Road West, Wayzata, Minnesota 55391. Cargill is a global producer and seller of Granulated Sugar. Since 2009, Cargill has owned and operated a sugar refinery in Gramercy, Louisiana.[15]

---

https://www.prnewswire.com/news-releases/american-sugar-refining-completes-purchase-of-tate--lyle-sugars-104075823.html (last visited April 13, 2024).

[12] *Id.*

[13] *Id.*

[14] *See supra* note 10.

[15] *Cargill starts shipping sugar from Louisiana Sugar Refining*, FOOD NAVIGATOR, https://www.foodnavigator-usa.com/Article/2011/02/14/Cargill-starts-shipping-sugar-from-Louisiana-Sugar-Refining (last visited April 13, 2024).

20.     Defendant Michigan Sugar is a Michigan corporation with its primary place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. Michigan Sugar is a cooperative consisting of 900 sugar beet grower-owners, and it is a global producer and seller of Granulated Sugar under the brand names Pioneer Sugar and Big Chief Sugar.[16] Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. Additionally, Michigan Sugar owns a production facility in Toledo, Ohio and an agricultural research center in Bay County, Michigan.[17]

21.     Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058. Commodity publishes a monthly report called the "Domestic Sugar Monthly Report" that contains information about, among other things, sugar supply and demand, and sugar spot pricing guidance. Throughout the Class Period, Defendant Commodity facilitated exchanges among the Producer Defendants of detailed, non-public, competitively sensitive information regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy.

22.     Defendant Wistisen is a Granulated Sugar industry analyst and the principal of Commodity. In furtherance of Defendants' contract, combination, or conspiracy, Defendant Wistisen knowingly and purposefully collected and shared among the Producer

---

[16] *About Us*, MICHIGAN SUGAR COMPANY, https://www.michigansugar.com/about-us/ (last visited April 13, 2024).

[17] *Id.*

Defendants, for a subscription fee, detailed, non-public, confidential, proprietary, and competitively sensitive information.

### C.     Agents and Co-Conspirators

23.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

24.     Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of Granulated Sugar. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

### IV.     FACTUAL ALLEGATIONS

### A.     Relevant Market

25.     "Granulated Sugar," also known as "white" or "table" sugar, refers to sugar that is extracted from sugar cane or sugar beet and ground to a certain size.[18] Granulated

---

[18]     Tracie     Abram,     *Sugars     defined*,     MICHIGAN     STATE     UNIVERISTY,

9

sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Granulated Sugar is the most common sweetener used in home food preparation and cookbooks and consumers tend to dislike any sugar substitute that does not match its sweetness profile. In 2020, the average American consumed 40 pounds of refined sugar.

26.     Granulated Sugar is made by extracting juice from the sugar cane or sugar beet, processing the juice to remove impurities and concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.[19]

27.     While Granulated Sugar derived from sugar cane is chemically indistinguishable from Granulated Sugar derived from sugar beets, their manufacturing processes are slightly different. Sugar extracted from cane is first processed into "raw sugar" and subsequently shipped to a refinery to be further processed into Granulated Sugar by washing and further removing remaining molasses and other non-sugar components. Sugar beets, on the other hand, are typically processed in a single facility where they are converted directly into Granulated Sugar. Sugar manufactured and refined through this process can be ground into powder or sold as liquid; however, Granulated Sugar accounts for approximately 80% of all refined sugar sold.[20]

---

https://www.canr.msu.edu/news/sugars_defined (last visited April 13, 2024).

[19] *Id.*

[20] *See* Proposed Findings of Fact of the United States [Redacted], *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. May 16, 2022), ECF No. 219, ¶ 25.

28.     Sugar cane and sugar beets are also grown in different climates. Sugar cane grows in semitropical or tropical climates, so in the United States, sugar cane is produced in Florida and the Southern areas of Louisiana and Texas.[21] Sugar beets are sturdier crops that are able to grow in rotation with other crops, and are grown in four primary regions encompassing the Great Lakes (Michigan), Upper Midwest (Minnesota and North Dakota), Great Plains (Colorado, Montana, Nebraska, and Wyoming), and Far West (Northern California, Idaho, Oregon, and Washington).[22]

29.     Granulated Sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into other types of sugar products.

30.     Granulated Sugar is a staple foodstuff commonly used by both commercial/industrial/institutional users such as bakeries, restaurants, confectionaries, and food manufacturers, as well as end users as an ingredient in baking, cooking, and sweetening foods and drinks. Many commercial, industrial, and institutional users purchase Granulated Sugar directly from the Producer Defendants or from intermediaries such as wholesalers, food service distributors, or grocery retailers. End user consumers typically purchase Granulated Sugar as an ingredient in prepared foods or in an unadulterated form from grocery stores.

---

[21] *Sugar & Sweeteners*, U.S. DEPARTMENT OF AGRICULTURE, ECONOMIC RESEARCH SERVICE, https://www.ers.usda.gov/topics/crops/sugar-and-sweeteners/background/ (last visited April 13, 2024).

[22] *Id.*

31.     Granulated Sugar is used in some industrial processes, such as the production of medications (as a bulking agent and a binder in tablets, such as lozenges),[23] bioplastics,[24] biofuels (sugar-based ethanol), and co-generation of electricity (cane bagasse).[25] However, according to one global estimate, only 25% of refined sugar is used for biofuels and other industrial applications, while 75% is used for food products.[26]

32.     Considering the ubiquity of its use in foods, beverages, and other applications, the global sugar industry is massive. In 2023, the global industrial sugar market was $39.59 billion, and it is projected to grow from $40.63 billion in 2024 to $50.76 billion by 2032.[27] According to one study conducted by Texas A&M University, sugar

---

[23] Been Eastick, *SUGARTalk, Industrial Insight*, Ragus, https://www.ragus.co.uk/how-is-sugar-used-in-the-pharmaceutical-industry/ (last visited April 13, 2024).

[24] John McKenna, *Scientists have made biodegradable plastic from sugar and carbon dioxide*, World Econ. Forum, https://www.weforum.org/agenda/2017/10/scientists-have-made-biodegradable-plastic-from-sugar-and-carbon-dioxide/ (last visited April 13, 2024).

[25] *About Sugar*, International Sugar Organization, https://www.isosugar.org/sugarsector/sugar (last visited April 13, 2024).

[26] An Investor Brief on Impacts that Drive Business Risks: Sugarcane, at 2, https://engagethechain.org/sites/default/files/commodity/Ceres_EngageTheChain_Sugarcane.pdf (last visited April 13, 2024).

[27] Fortune Business Insights, Food Processing & Processed Food/Industrial Sugar Market, Industrial Sugar Market Size, Share & Industry Analysis, By Source (Cane Sugar and Beet Sugar), Type (White Sugar, Brown Sugar, and Liquid Sugar), End Use (Beverages, Confectionary, Bakery Products, Dairy Products and Other Food Applications), and Regional Forecast, 2024-2032 (April 7, 2024), https://www.fortunebusinessinsights.com/industrial-sugar-market-102462 (last visited April 13, 2024).

production in the United States has an annual economic impact, including direct sales, indirect sales, and end user sales, of more than $23 billion.[28]

33.     Granulated Sugar is a commodity product with little or no product differentiation between producers. Sugar futures contracts are traded on the Intercontinental Exchange ("ICE") as "White Sugar" under the symbol "W" alongside other commodity products such as wheat, crude oil, and gold.[29] Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service.

34.     Due to the lack of product differentiation, Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer impact the market price for Granulated Sugar.

35.     While an individual producer often has the incentive to offer lower prices than competing producers to capture greater market share and make greater sales, price competition throughout the industry ultimately reduces the profitability of the industry as a whole. Thus, the commodity nature of Granulated Sugar makes it easier to implement a price-fixing cartel and provides industry players with the incentive to agree to not compete on price.

---

[28] Agriculture and Food Policy Center, Economic Impact of the U.S. Sugar Industry, at 8, 9 (June 2022), https://sugaralliance.org/wp-content/uploads/2022/06/Sugar-Report.pdf.

[29] *ICE Futures U.S.*, ICE, https://www.ice.com/futures-us (last accessed 04/13/24); *Products – Futures & Options, Agricultural*, ICE, https://www.ice.com/products/Futures-Options/Agriculture (last visited April 13, 2024).

36.     The domestic market for Granulated Sugar, like many American industries, has gone through significant consolidation. For example, in 2019, United sought to acquire competitor Imperial Sugar Company ("Imperial").[30] Subsequently, U.S. Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar would acquire Imperial, and United would market and sell all of the refined sugar produced by Imperial.[31] In 2021, the United States Justice Department sued to block the proposed merger, arguing that the acquisition "would leave an overwhelming majority of refined sugar sales across the Southeast in the hands of only two producers" and would create higher prices for businesses and consumers.[32] Following a trial, a Delaware Court declined to block the merger, and the decision was upheld by the Third Circuit Court of Appeals.[33] The merger was finalized later that year. United now boasts that it is "currently supplying approximately one-quarter of the total U.S. sugar demand."[34]

---

[30] Complaint, *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. Nov. 23, 2021), ECF No. 1, ¶ 12.

[31] *Id.* at ¶ 13.

[32] *Justice Department Sues to Block U.S. Sugar's Proposed Acquisition of Imperial Sugar*, DOJ, OFFICE OF PUBLIC AFFAIRS, https://www.justice.gov/opa/pr/justice-department-sues-block-us-sugar-s-proposed-acquisition-imperial-sugar (last visited April 13, 2024).

[33] *See* Memorandum Opinion [Sealed], *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. Sept. 23, 2023), ECF No. 243; *United States v. U.S. Sugar Corp.*, 73 F.4th 197 (3d Cir. 2023).

[34] *Who We Are*, UNITED SUGAR PRODUCERS & REFINERS, https://unitedsugarpr.com/who-we-are/our -members/ (last visited April 13, 2024).

37.     Similarly, ASR, along with the Sugar Cane Growers Cooperative of Florida, acquired Defendant Domino in 2001.[35] In 2005, ASR Group purchased domestic competitor California and Hawaiian Sugar Company (C&H Sugar), and in 2007, it acquired Jack Frost (National Sugar Company), and Redpath Sugar (Tate & Lyle's Canadian sugar refining operations).[36] In 2010, ASR completed its takeover of Tate & Lyle's sugar business by acquiring their refineries in London and Lisbon.[37]

38.     Michigan Sugar also is a product of consolidation in the industry. In 2004, Michigan Sugar Company purchased Monitor Sugar Company.[38] Later, in 2016, Michigan Sugar purchased Michigan-based cane sugar refiner and manufacturer AmCane Sugar LLC, which would "increase its sugar sales volumes by nearly 15%."[39]

39.     During the Class Period, the Producer Defendants collectively controlled a majority of the domestic market for Granulated Sugar. As of 2021, three of the Producer Defendants (United, ASR/Domino, Michigan Sugar) accounted for nearly 70% of the

---

[35] *History Timeline*, ASR GROUP, https://www.asr-group.com/about-us/history-timeline (last visited April 13, 2024).

[36] *Id.*; *see also American Sugar Refining Completes Purchase of Tate & Lyle Sugars*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/15merican-sugar-refining-completes-purchase-of-tate–lyle-sugars-104075823.html (last visited April 13, 2024).

[37] *American Sugar Refining Completes Purchase of Tate & Lyle Sugars*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/american-sugar-refining-completes-purchase-of-tate--lyle-sugars-104075823.html (last visited April 13, 2024).

[38] *History*, MICHIGAN SUGAR, https://www.michigansugar.com/about-us/history/ (last visited April 13, 2024).

[39] Michigan Farmer, *Michigan Sugar Company acquires assets of AmCane Sugar LLC*, FARM PROGRESS, https://www.farmprogress.com/farm-business/michigan-sugar-company-acquires-assets-of-amcane-sugar-llc (last visited April 13, 2024).

domestic Granulated Sugar Market.[40] This is illustrated by Defendants themselves; upon hearing the announcement regarding Imperial's acquisition by United, one Producing Defendant noted that "they view this as 1 less competitor and now 3 companies account for 75% of the market."[41]

### B.    The History of Collusion in the Sugar Industry

40.    The sugar industry in the United States has a long and checkered history of antitrust violations, including conduct similar to Plaintiff's allegations here.

41.    In 1936, the United States Supreme Court upheld a lower court finding that the major refined sugar producers had unreasonably restrained trade by, among other things, creating the "Sugar Institute," an industry trade association which imposed member rules whereby "defendants agreed to sell, and in general did sell sugar only upon open prices, terms and conditions publicly announced in advance of sales, and they agreed to adhere and in general did adhere without deviation, to such prices, terms and conditions until they publicly announced changes."[42]

---

[40] *See* Defendant United's Proposed Findings of Fact [Redacted], *United States v. U.S. Sugar Corp.*, No. 21-cv-01644 (D. Del. May 26, 2022), ECF No. 231, ¶ 177.

[41] Attachment to Motion for Protective Order by American Sugar Refining, Inc. [Redacted], Email from ASR/Domino's Adam Whittaker dated 3/25/21, *U.S. v. United States Sugar Corp., et al.*, No. 21-cv-1644-MN (D. Del. April 18, 2022), ECF 207-24, at 2.

[42] *Sugar Institute, Inc. v. United States*, 297 U.S. 553, 582 (1936).

42.     In 1947, Sugar producers in California were accused of conspiring with one another to fix prices they paid to acquire sugar beets from growers.[43] Plaintiffs prevailed at trial and were awarded treble damages and attorneys' fees.

43.     In 1978, sugar producers – again sued for anticompetitive conduct – entered into a consent decree with the United States Department of Justice where they were enjoined from, among other things, entering into any future agreements or combinations to: "fix, raise, maintain, or stabilize the prices, terms or conditions for the sale of refined sugar," "give any prior notice of or announce in advance any change or contemplated change in prices, terms or conditions for the sale of refined sugar", "[d]irectly communicat[e] to any other refiner information concerning Future Prices", or "[r]equest[], require[e] or coerc[e] any third person . . . to communicate to any other refiner, information concerning Future Prices."[44]

**C.     Defendants' Agreement to Artificially Raise, Fix, Maintain, or Stabilize Prices of Granulated Sugar**

44.     Since at least January 1, 2019, the Producer Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar in the United States. To implement their unlawful contract, combination, or conspiracy, the Producer Defendants, among other things, shared detailed, accurate, non-public, and

---

[43] *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 221 (1948).

[44] *United States v. Great W. Sugar Co.,* No. 74-cv-02674, 1978 WL 1399, at *2 (N.D. Cal. Sept. 13, 1978).

competitively sensitive information with each other, including through Commodity. This regular information exchange has taken place for years.[45]

45. Commodity is a subscription-based service that is apparently unavailable to any person or entity besides sugar producers. Commodity has no public website, does not advertise its services to the public, and does not publish its reports on the sugar industry. Moreover, the information that Commodity gathers is not from voluntary surveys or periodic polling of industry players; its information is provided directly and non-anonymously by the Producer Defendants. The fact that Commodity does not make its reports available to purchasers of Granulated Sugar or others in the supply chain gives those who do have access to this information – the Producer Defendants – an unfair competitive advantage over other market participants.

46. The information voluntarily given to Commodity by Producer Defendants includes their current pricing, future or forward pricing, pricing strategies, crop size/yields, sold positions, spot prices, and contract prices. This information is shared with Commodity on a routine and rapid basis and, in turn, given to Producer Defendants in such a manner that they have what is essentially a real-time view of other Producer Defendants' prices.

47. The Producer Defendants are aware that the sharing of this competitively sensitive information is anticompetitive and would be detrimental to their business interests. Indeed, in a competitive market, information such as the Producer Defendants'

---

[45] *See* Proposed Findings of Fact of the United States [Redacted], *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. May 16, 2022), ECF No. 219, ¶¶ 140-151.

Granulated Sugar prices and sold positions – the percentage of its crop that is already sold for the fiscal year – should be kept confidential from third parties, including the other Producer Defendants and competitors, and the general public.

48.     The Producer Defendants had explicit rules and guidelines which prohibited their sharing of this kind of information, but they nonetheless shared it with Commodity, often via their high-level executives who had direct involvement in pricing, and Commodity then shared the information with their direct competitors. For example:

a)      United's sold position was confidential, and its employees are supposed to keep that information closely guarded. Moreover, United does not publish the company's current Granulated Sugar prices. Nevertheless, United voluntarily shared its sold position with Commodity with the knowledge that Commodity would publish the information to the other Producer Defendants.

b)      ASR/Domino has a written code of conduct with an ethics policy that prohibits any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees shared non-public, confidential, and competitively sensitive information with Commodity with the knowledge that Commodity would publish the information to the other Producer Defendants.

49.     The Producer Defendants used the information they obtained from Commodity to set prices for their products pursuant to their price-fixing agreement,

allowing them raise, fix, maintain, or stabilize Granulated Sugar prices pursuant to their price-fixing agreement.

50.     There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity or other means to secretly share highly confidential and proprietary information such as their pricing, crop yields, or sold positions in the level of detail that they do and without anonymization. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret to prevent competitors from, inter alia, offering prices to purchasers below what they know the competing producer is capable of offering. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition. On the other hand, this type of regular exchange of information is highly effective at creating, maintaining, and monitoring a conspiracy to artificially inflate prices.

51.     The purpose and goal of this information exchange is clear: to avoid price competition between the Producer Defendants by ensuring that they do not undercut each other on price, and thus maintain Granulated Sugar prices that are higher than they would be in a competitive market. The Producer Defendants, as the dominant producers in the domestic market and with assurances of pricing discipline from one another, are not impacted by smaller market participants who would be unable to satisfy demand from customers who are looking for lower prices.

52.     Moreover, knowing a producer's sold position is especially indicative of an anticompetitive market because it allows competitors to know what percentage of a producer's supply has already been sold – and in the inverse, how much more they have to

sell. Generally, as a producer's sold position increases and they have sold more of their supply, they will be aggressive on pricing – that is, they will raise prices. Thus, knowing competitors' sold positions allows the Producer Defendants to anticipate when competitors are going to raise their prices.

53.    Additionally, due to the production allotments of the United States Department of Agriculture ("USDA"), which linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that, as they sell out of Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce price. Thus, knowing each other's sold positions allows the Producer Defendants to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the remaining supply.

54.    All of the Producer Defendants engaged in direct and indirect exchanges of competitively sensitive information, including current and prospective/future/forward prices and sold positions, which was specifically coordinated so they would timely receive each other's information. For example:

    a)    March 3, 2020 – ASR/Domino's Mr. Henderson emailed colleague Mr. Sproull to report on his attendance at the International Sweetener Colloquium. His report discussed Cargill's prospective "Competitive Numbers" for Fiscal Year 2021, revealed that Cargill's future pricing would be at "$37.50 gross FOB," and shared other Cargill-specific supply information obtained at the Colloquium. He also reported that

21

for Fiscal Year 2021: "Michigan firm at $38.50 for 2021. United took prices up to $36.50 FOB."

b)    August 17, 2020 – Mr. Wistisen shared Michigan's information with ASR/Domino's Mr. Henderson, stating "Just getting started on crop updates. Michigan: bumped from 29 tpa to 29-30 tpa."[46]

c)    August 18, 2020 – ASR/Domino's Mr. Henderson emailed colleague Mr. Sproull, stating: "Ok, hearing reports that Cargill is moving close 80% sold for FY21. We are trying to find out if this correlates to an increase in their pricing." On the same day, Mr. Wistisen reported in an email to Mr. Henderson that there was "some talk of Cargill moving prices up to $37.70 gross fob." He also stated: "My goodness, what a difference a month makes. Michigan 85+% booked, Western 75-%."

d)    August 2020 – Internal ASR/Domino emails reveal that they were informed that "Cargill is well sold thru 21, current # is $37 net/$37.75 gross," and that Cargill was included on a report of "Updated pricing" which showed "Cargill @ $37 – 38." In those same emails,

---

[46] On other occasions, Mr. Wistisen told both United and ASR/Domino that the information he provided on Michigan Sugar came directly from Michigan Sugar. For example, when discussing pricing with Domino's Mr. Henderson, Mr. Wistisen said he did not yet have Michigan Sugar's pricing, but assured Mr. Henderson: "I hope to talk with them [Michigan Sugar] on Fri./Mon."

ASR/Domino's Mr. Whittaker said it was "suspicious" that "Cargill [is] moving up to $37.75."

e)    September 21, 2020 – Mr. Wistisen reached out to United's Mr. Speece, noting: "Hearing beets well sold, except possible NSM (80-85%), and prices firm to higher. Michigan $38.5+." Mr. Wistisen also reported to ASR/Domino's Mr. Henderson: "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th," later also adding that Michigan Sugar's pricing was at "$38.5+, selective selling."

f)    September 21, 2020 – On the same day as above, Mr. Wistisen also emailed United's Mr. Speece and ASR/Domino's Mr. Henderson within six minutes of each other to ask about their current prices and if they will be "firm to higher." Within a day, both competitors reported their prices and sold positions, and Mr. Wistisen then communicated each respective competitor's report to the other less than a minute apart.

g)    September 22, 2020 – Mr. Wistisen reported to ASR/Domino's Mr. Henderson that "Cargill is well sold for FY21 but not calendar year 21." He also stated: "Waiting to confirm from Michigan [Sugar]."

h)    November 16, 2020 – Mr. Wistisen contacted United's Eric Speece and asked, "Where would you put spot and forward beet prices?" Approximately 38 minutes later, Mr. Wistisen asked Domino's Alan

Henderson, "Where would you put prices and cane coverage?" Both Mr. Speece and Mr. Henderson responded that same day with pricing information. The next day, Mr. Wistisen emailed United's Mr. Speece and relayed the specific pricing information that Domino's Mr. Henderson had shared with him the day prior: "ASR saying prices keep climbing: $46 spot all locations…. Waiting to hear back from most contacts." Mr. Wistisen also emailed Mr. Henderson that same day and forwarded the pricing information shared by Mr. Speece.

i)   February 15, 2021 - Mr. Wistisen wrote to United's Mr. Speece: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners. I'll send along indications." Mr. Speece responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen then asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" Mr. Speece answered the following day: "Give me a ring and we can discuss." On the day after that, Mr. Wistisen exchanged emails with ASR/Domino's Mr. Henderson about United's prospective pricing strategy: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50

24

based on demand… Selling FY21 firm, good activity, little to no competition from NSM or Western."

j)     May 18, 2021 – Mr. Wistisen informed ASR/Domino's Mr. Henderson: "Just talked with United: prices unchanged…[b]ut expect big action over the next month, 20+% add to bookings, and at that time expect to raise prices, and not by just a dollar."

k)     June 16, 2021 – Mr. Wistisen advised ASR/Domino's Mr. Henderson: "The word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm…. Any changes in ASR/Domino forward prices? I have you at [redacted] and [redacted]." Later, Mr. Wistisen confirmed: "The United info I provided was direct from them this morning."

l)     June 17, 2021 – Mr. Wistisen emailed ASR/Domino's Mr. Henderson reporting crop size/yield information, including: "Michigan: above average crop, 50% excellent development…drop up 1.50 tpa above average."

m)     July 12, 2021 – Domino's Mr. Henderson wrote his colleagues Mr. Whittaker and Mr. Dahlman, again forwarding United's pricing information, stating: "FYI below… United price increase. Rich [Wistisen] is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

25

55.    The information exchanged through Commodity, acting as a conduit, was accurate to the point that the Producer Defendants could rely on it. For example, on February 17, 2021, Domino's Mr. Henderson wrote his colleague, Mr. Whittaker, forwarding information about competitor United received by Mr. Wistisen, noting, "United is usually pretty upfront with Rich [Wistisen]."

56.    The communications between the Producer Defendants were also clearly meant to signal the producers' prices. For example:

a)    September 2019 – Defendant United's CEO stated that "we tried to push prices higher" by putting "an expiration date" on pending offers, which he further explained "sen[t] a message" to "competitors that we were not interested in allowing the market to slip lower." Similar documents unveiled by the DOJ further reveal a Domino executive stating, "We need to signal to the market that we're going to maintain price," one executive stating that the "main downside" to lowering an Imperial bid "would be snatching something from United just as they are starting to show some upside price movement."

b)    January 8, 2020 – ASR's Rob Sproull emailed his colleague Alan Henderson stating: "I think it's really important we signal to the market that there's still going to be tightness…We need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter."

c)     June 18, 2020 – ASR Group's Alan Henderson emailed his colleague, Adam Whittaker, regarding a quote needed for major customer Piedmont Candy Corporation, where he stated he "would love to get aggressive here [on pricing]" but "[w]e would like to avoid sending a signal out to competitors that we are chasing business and lowering price off the standard $41.00 bulk basis."

d)     January 20, 2021 – United's Eric Speece emailed his colleague at United, Dirk Swart, that one competitor was selling at too low a price and suggested, "May want to communicate pricing earlier than the colloquium to send a msg. I'll plan on calling him tomorrow as it is always easier than black and white. Let me know if there are any key messages you would like me to relay on."

57.     These communications also illustrate that the Producer Defendants were aware of the illegality of the information exchange and were careful to avoid detection of their unlawful agreement. For example, in one email, United's Mr. Speece stated while discussing an information exchange: "I will call him rather than put in writing."

### D.     Governmental Guidelines Prohibiting Defendants' Conduct

58.     The "Guidelines for Collaborations Among Competitors" issued in 2000 by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information…. [I]n some cases, the

sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.[47]

59.    A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors:

[C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a "contract, combination … or conspiracy" that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[48]

60.    Four years later, in 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that

---

[47] Roundtable on Joint Ventures, Note by the US Federal Trade Commission and the US Department of Justice, 15–16 (Oct. 9, 2000) ,https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

[48] OECD, Information Exchanges Between Competitors under Competition Law 294 (2010), https://www.academia.edu/79222152/Information_Exchanges_Between_Competitors_under_Competition_Law (last visited April 13, 2024).

may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[49]

61.     Just last year, on February 23, 2023, Doha Mekki, the Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchange among competitors."[50]

### E.     The Structure and Characteristics of the Granulated Sugar Market that Make it Highly Susceptible to Collusion

62.     The Granulated Sugar market bears all the characteristics of a highly cartelized market: (1) producer concentration, (2) vertical integration, (3) high barriers to entry, (4) commodity product, (5) inelastic demand, (6) trade associations, and (7) protective USDA policies.

63.     <u>Producer Concentration</u>. Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when just a few firms collectively control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players. A high degree

---

[49] Micheal Bloom, *Information exchange: be reasonable*, FTC (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (last visited April 13, 2024).

[50] *Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023*, DOJ, OFFICE OF PUBLIC AFFAIRS (Feb. 2, 2023), https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0. These remarks were made during a discussion of the healthcare industry but are equally applicable to other industries.

of control simplifies coordination because little outside competitive presence exists to undermine the cartel, and cartel participants can more easily monitor each other's actions related to supply and pricing. Moreover, in a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might achieve by undercutting their cartel price.

64.     As noted above, the Granulated Sugar industry experienced significant consolidation leading up to and during the Class Period. For example, ASR's acquisition of several domestic and international competitors between 2001 and 2016, and United's acquisition of Imperial in 2023, concentrated the majority of the market for Granulated Sugar in the hands of the Producer Defendants. Through consolidation, three of the Producer Defendants (United, ASR/Domino, Michigan Sugar) collectively controlled nearly 70% of the of the domestic Granular Sugar Market.[51]

65.     <u>Vertical Integration</u>. The Granulated Sugar industry is almost entirely vertically integrated, with the Producer Defendants owning or tightly controlling almost all aspects of producing sugar cane and sugar beets, processing and refining them into Granulated Sugar, and marketing and selling Granulated Sugar. The Producer Defendants all hold themselves out as vertically integrated operations.[52]

---

[51] *See* Defendant United's Proposed Findings of Fact [Redacted], *United States v. U.S. Sugar Corp.,* No. 21-cv-01644 (D. Del. May 26, 2022), ECF No. 231, ¶ 177.

[52] *Domino Sugar Yonkers Refinery Receives Maiden Delivery of Raw Sugar from the First New Ongoing, Dry Cargo Barge of its Size Built in America in Nearly 20 Years*, ASR GROUP (May 20, 2022), https://www.asr-group.com/news/Knot-Refined-Makes-Maiden-Delivery-to-Domino-Sugar-Yonkers-Refinery ("The investment in the barge … will further vertically integrate the operations of ASR Group and its parent companies."); *Who*

66.     <u>High Barriers to Entry</u>: Barriers to entry are obstacles that prevent new competitors from entering a market. They restrict competition in a market and may make it easier for incumbents to collude. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

67.     There are high barriers to entry that have kept would-be competitors out of the Granulated Sugar industry. A new entrant into the market would require substantial capital in order to plan, design, and build the necessary facilities, as well as obtain the necessary permits from national, state, and local agencies. New entrants would need to comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan. Additionally, market entrants would be at a significant disadvantage to incumbent producers who are vertically integrated and have existing

---

*We Are*, UNITED SUGAR PRODUCERS & REFINERS, https://unitedsugarpr.com/who-we-are/our-members (last visited April 13, 2024) (referring to "[o]ur fully integrated business structure of pooled members"); Michigan Sugar Company Written Statement to the House Agricultural Committee 1 (Feb. 20, 2019), https://www.house.mi.gov/Document/?Path=2019_2020_session/committee/house/standing/agriculture/meetings/2019-02-20-1/documents/testimony/AGRI%20Testimony%20MI%20Sugar%20Co%20022019.pdf ("First, we are completely vertically integrated."); Emiko Terazono, *Cargill joint venture positioned to beat sugar market blues*, FINANCIAL TIMES (Jan. 22, 2015) https://www.ft.com/content/2d0dd99c-a168-11e4-bd03-00144feab7de ("Sugar is slowly playing catch up with other commodity sectors, where the name of the game is vertical integration.").

relationships with other members of the supply chain and consumers. Finally, incumbent producers have the benefit of economies of scale and access to loans and production allotments offered by the USDA which are available only to the larger, vertically integrated producers.

68.     <u>Commodity Product</u>. A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods and services. Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price, as opposed to other attributes such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors, such as special product features, quality, reliability, and durability, or other terms of a transaction.

69.     As described above, Granulated Sugar is a commodity product. For example, Granulated Sugar sold by United, ASR/Domino, Michigan Sugar, and Cargill are virtually indistinguishable and have nearly identical nutritional content. Options and futures for Granulated Sugar – listed as "White Sugar" – are traded as commodities on the ICE.

70.     <u>Inelastic Demand</u>: "Price elasticity" is a term used to describe the sensitivity of suppliers or consumers to changes in the price of a good or service. For example, demand is said to be inelastic if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. Under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, so they continue

32

to purchase despite a price increase. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

71.     Demand for Granulated Sugar is relatively insensitive to price changes. The market for Granulated Sugar in the United States is characterized by inelastic demand because there are no meaningful substitutes for Granulated Sugar. Thus, the Producer Defendants know they can demand higher prices without the fear of purchasers switching to another product.

72.     Trade Associations: The existence of industry trade associations makes a market more susceptible to collusive behavior because they provide a pretext under which co-conspirators can exchange sensitive company information, such as pricing, and allocate the market. Industry trade associations also provide mechanisms for sharing information and monitoring, deterring, detecting, and punishing cheating.

73.     The Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. For example, the Board of the Sugar Association includes Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of United), Matt Hoffman (Sugar Cane Growers

Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar Company), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Dak, one of the member-owners of United)[53]. These memberships afford them opportunities to collude during the Class Period.

74.    <u>Protective USDA Policies</u>. The Producer Defendants benefit from the USDA's Sugar Program which – although it does not set, approve, or otherwise regulate actual sale prices for Granulated Sugar – limits the number of sources of raw sugar from which Granulated Sugar can be refined and protects the Producer Defendants from foreign competition by limiting imports. As a result of this program, the Producer Defendants know they can charge higher prices for Granulated Sugar as their sold positions increase because there will be little to no additional competitive product available in the market to constrain them.

### F.    Defendants' Successful Inflation of the Price of Granulated Sugar Above Competitive Levels During the Class Period

75.    The price of Granulated Sugar became significantly elevated during the Class Period as a result of Defendants' conduct. This is contrary to prior pricing patterns and despite the fact that supplies did not decrease.

---

[53] *Board Members*, THE SUGAR ASSOCIATION, https://www.sugar.org/about/board/ (last visited April 13, 2024).

76.   In the past 20 years, the price of Granulated Sugar has doubled on an indexed basis. There is no economic rationale for the rate of price increases during the past four years of the Class Period.

77.   The following chart depicts the producer price index for the Sugar Manufacturing sector during the Class Period and the five years preceding it:



Click and drag in the plot area to zoom in. Hover over chart to view data.
Source: U.S. Bureau of Labor Statistics.

## V.   <u>ANTITRUST INJURY & DAMAGES</u>

78.   Defendants' anticompetitive conduct has had the following effects, among others:

    a)   Price competition in the Granulated Sugar Market has been restrained or eliminated;

b)      Prices for Granulated Sugar sold by the Producer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c)      Direct purchasers of Granulated Sugar have been deprived of free and open competition; and

d)      Direct purchasers of Granulated Sugar have paid artificially inflated prices.

79.     The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Granulated Sugar and, as a direct and foreseeable result, Plaintiff and the class have paid supracompetitive prices for Granulated Sugar during the Class Period

80.     By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury to their businesses or property, having paid higher prices for Granulated Sugar than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

81.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.   CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, injunctive relief,

and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons and entities who purchased Granulated Sugar directly from any of the Producer Defendants or any of their co-conspirators in the United States at any time from January 1, 2019 until the present (the "Class Period").

> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

83.     Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

84.     Class Identity: The above-defined Class members are readily identifiable from information and records in the possession of United, ASR/Domino, Cargill, and/or Michigan Sugar.

85.     Numerosity: Plaintiff does not know the exact number of class members because such information is presently in the exclusive control of the Producer Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are hundreds of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

86.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Granulated Sugar directly from one or more of the Producer Defendants and were damaged by the same common course of wrongful conduct.

37

87.   <u>Common Questions Predominate</u>: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual class members, including, but not limited to:

A.   Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Granulated Sugar sold in interstate commerce in the United States in violation of federal antitrust laws;

B.   Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws.

C.   The identity of the participants of the alleged conspiracy;

D.   The scope and duration of the alleged conspiracy;

E.   The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

F.   The effect of Defendants' alleged conspiracy on the prices of Granulated Sugar sold in the United States during the Class Period;

G.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

H.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

I.   The appropriate class-wide measure of damages; and

J. Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

88. <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

89. <u>Superiority:</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

90. <u>Injunctive Relief:</u> Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII.   <u>FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING</u>

91. Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for Granulated Sugar.

92. The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing or supply restraint communications on documents, communication of competitively sensitive data to one another through Commodity, a nonpublic system that was inaccessible to anyone except Granulated Sugar producers and which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

93. Plaintiff and Class members did not have actual or constructive notice of the conspiracy alleged herein until, at the earliest, the public dissemination of the DOJ's

Findings of Fact in support of its petition to stop the merger of United and Imperial. In particular, the full scope of Defendants' unlawful conduct could not have been discovered until the appellate exhibits from that matter were made available to the public.

94.     Plaintiff and Class members relied on Defendants' promises to obey the law and act with integrity, and those promises prevented Plaintiff from discovering Defendants' conduct earlier. For example:

A.     The letter introducing ASR Group's Code of Ethics and Business Conduct states: "Throughout our long history, ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations.… We seek success in all of our business endeavors. However, we may only do so while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work."[54] The Code contains a section devoted to "Following Antitrust and Competition Laws," which, among other things, prohibits ASR Group and its employees, officers, and directors from entering into "[p]rohibited agreements and activities," including "[a]greements with competitors to fix or control prices," and, "[t]o ensure that [they] avoid these illegal agreements, [they] may not

---

[54]   ASR Group, Code of Ethics and Business Conduct 1, https://www.asr-group.com/sites/asr_group_com/files/2023-01/ASR%20Group%20-%20Code%20of%20Ethics%20and%20Business%20Conduct%20%282020-01-20%29%20English%20-%20Final%20-%20Website%20%281%29.pdf (last visited April 13, 2024).

engage in direct or indirect discussions or other contacts with competitors regarding … [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales."[55]

B.   Cargill's Code of Conduct states: "**We obey the law.** Obeying the law is the foundation on which our reputation and Guiding Principles are built. As a global organization privileged to do business all over the world, we have the responsibility to comply with all of the laws that apply to our business."[56] With respect to antitrust compliance in particular, Cargill states: "Conducting business in compliance with these [antitrust] laws has contributed to Cargill's growth and prosperity throughout the years. While these laws are complex and can vary country to country, they generally prohibit competitors from working together to limit competition…. All employees are expected to follow competition laws, as well as Cargills' own competition policy. Employees must also be careful when interacting with competitors—for instance, in connection with trade associations and benchmarking. Another way of preserving fair and honest competition involves the proper collection and use of competitive intelligence. Gathering competitive information and business data is an appropriate

---

[55] *Id.* at 8–9.

[56] *Code of Conduct*, CARGILL, https://www.cargill.com/about/code-of-conduct (emphasis in original) (last visited April 14, 2024).

business practice, but it must be done legally and ethically."[57] In its chart of "Competition Do's and Don'ts," Cargill explicitly instructs its employees "Don't: Discuss prices, sales plans or volumes with competitors." [58]

C.  Michigan Sugar's "Sustainability & Corporate Social Responsibility" webpage states: "At Michigan Sugar Company, we live by our values – Excellence, Pride, Integrity, Compassion and Trust. This is the foundation of a business environment that sets respect and dignity for co-workers, suppliers, customers, and partners as an absolute expectation."[59] It further states: "[W]e are committed to creating a responsible business model that serves and builds value for our grower-owners, employees, customers, suppliers, and other stakeholders now and in the future."[60]

D.  United's Code of Business Conduct and Ethics states: "Obeying the law, both in letter and in spirit, is the foundation on which our ethical

---

[57] Cargill, Our Guiding Principles: Cargill Code of Conduct 13, https://www.cargill.com/doc/1432076403017/guiding-principles-en.pdf (last visited April 14, 2024).

[58] *Id.*

[59] *Sustainability & Corporate Social Responsibility*, MICHIGAN SUGAR, https://www.michigansugar.com/about-us/sustainability-corporate-social-responsibility/ (last visited April 14, 2024).

[60] *Id.*

standards are built. All our employees, officers, directors, agents and other representatives must respect and obey the laws of the cities, states and countries in which we operate."[61] It further states: "Our employees, officers, directors, agents and other representatives must maintain the confidentiality of confidential information entrusted to them by us or our customers, except when disclosure is authorized in writing by a supervisor or required by laws or regulations. Confidential information includes, without limitation, any information that derives independent value because it is not known by third parties, including United Sugar's competitors or the general public, whether or not expressly identified as confidential."[62]

95.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

---

[61] Code of Business Conduct and Ethics, United Sugars Corporation, Adopted by the Board of Directors 1 (Mar. 16, 2020), https://unitedsugarpr.com/wp-content/uploads/2021/04/United-Sugars_-Code-of-Conduct-and-Ethics-Updated-March-2020.pdf.

[62] *Id.* at 6.

## VIII.  <u>CLAIM FOR RELIEF</u>

**Violation of Sections 1 and 3 of the Sherman Act
Section 4 and 16 of the Clayton Act
(15 U.S.C. §§ 1, 3, 15(a), 26)**

96.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

97.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2019, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

98.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2019, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States. The agreement was intended to and did unreasonably restrain trade, and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

99.     Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold in the United States to Plaintiff and members of the Class.

100.    This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

101.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

A.      Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;

B.      Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

C.      Those who purchased Granulated Sugar directly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

102.    Plaintiff and Class Members have been injured and will continue to be injured in their businesses and property by paying more for Granulated Sugar purchased

directly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

103. Plaintiff and Class Members are entitled to damages, treble damages, and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests judgment against Defendants, as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

C. That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and

47

restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

  E. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

  F. That Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

  G. That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

  H. That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## X.  DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: April 18, 2024

*/s/ Daniel C. Hedlund*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#0388166)
Joshua J. Rissman (#0391500)
Anthony J. Stauber (#0401093)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
tstauber@gustafsongluek.com

Dianne M. Nast
Daniel N. Gallucci
Joseph N. Roda
Michele S. Burkholder
Michael S. Tarringer
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
dgallucci@nastlaw.com
jnroda@nastlaw.com
mburkholder@nastlaw.com
mtarringer@nastlaw.com

Christopher V. Le
Brian P. Drockton
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
cle@boiesbattin.com
bdrockton@boiesbattin.com

Kenneth A. Wexler
Justin N. Boley
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com

Adam J. Zapala
Elizabeth Castillo
James G.B. Dallal
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett
**COTCHETT, PITRE & MCCARTHY, LLP**
40 Worth Street, Ste. 602
New York, NY 10013
Tel: (212) 201-6820
abarnett@cpmlegal.com

***Counsel for Plaintiff and the Proposed Class***